**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**


**JACK COPPINGER,**

      **Plaintiff,**

                                    **Case No. 3:07cv458/MCR/MD**

**v.**

**WAL-MART STORES, INC., et al.,**

      **Defendants,**

_____/

## O R D E R

Before the court is Defendants Wal-Mart Stores, Inc., Wal-Mart Stores East, L.P., Wal-Mart Stores East, Inc., and Elwin Jones' ("Wal-Mart") Motion for Summary Judgment (doc. 79) on Plaintiff Jack Coppinger's ("Coppinger") claims that Wal-Mart intentionally discriminated against him based on race and sex in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) *et seq.*[1]  Specifically, Coppinger, a Caucasian male formerly employed by Wal-Mart, alleges the defendants improperly used his race and sex to (1) demote him from a supervisory position;[2] (2) deny him a promotion

---

[1]  Coppinger's complaint makes no distinction between the factual allegations complained of under Title VII and those that allegedly violate § 1981. Unlike Title VII, which prohibits employers from discriminating against employees with respect to the terms of employment because of race, sex, or certain other grounds, 42 U.S.C. § 2000e-2(a)(1), § 1981 only prohibits discrimination in making and enforcing contracts based on race. 42 U.S.C. § 1981(a). "Both of these statutes have the same requirements of proof and use the same analytical framework" in an employment discrimination suit. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The court, therefore, does not distinguish between them in discussing Wal-Mart's motion. Section 1981 guarantees "[a]ll persons" the same right to enforce contracts "as is enjoyed by white citizens," 42 U.S.C. § 1981(a), but white employees can also state a claim of employment discrimination under the statute. *See A.B.E.L. Services*, 161 F.3d at 1333-34.  However, individual capacity suits against defendants like Elwin Jones are inappropriate under Title VII, which only grants relief "against the *employer*, not individual employees whose actions would constitute a violation of the Act." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991); *see also Dearth v. Collins*, 442 F.3d 931, 933 (11th Cir. 2006) ("[A] Title VII claim may be brought against only the *employer* and not against an individual employee.").

[2]  Despite Wal-Mart's assertion that it seeks final summary judgment, its motion does not address the demotion issue.  Demotion was raised in Coppinger's Charge of Discrimination to the Equal Employement Opportunity Commission ("EEOC"), (Complaint at Ex. A), and the complaint filed in this court. (*See* Complaint

given to a Hispanic male;[3] and (3) deny him two promotions given to a Hispanic woman. Wal-Mart also seeks summary judgment on Coppinger's claim that Wal-Mart constructively discharged him. After carefully considering Wal-Mart's motion, Coppinger's response, and the entire record, the court concludes that Wal-Mart's motion for summary judgment should be granted.

## BACKGROUND

In June, 2004, Wal-Mart instituted a new pay grade system in its stores across the nation. This new system marked a significant change in the way jobs were created and paid in Wal-Mart's individual outlets. Formerly, store managers had considerable flexibility in adding new positions required to operate each store, paying employees (known as "associates"), and scheduling their hours. By contrast, new positions became available under the 2004 plan through an automated scheduling system that kept track of each store's sales volume, size, and location. Once an individual store met Wal-Mart's internal criteria for a new position, the scheduling system would make work hours available to that store's manager, who could then advertise the job. Every job performed in Wal-Mart's stores was identified by the system and given a specific level and pay grade establishing the wage parameters for the position. In addition, some existing jobs were retitled. The new pay system – known as the "level system" – gave a higher pay rate to each higher job level and created considerably greater uniformity of jobs and pay throughout Wal-Mart's stores.

Coppinger began working at Wal-Mart's Store 1222 in Pensacola, Florida in April, 1995, and was employed there when Wal-Mart introduced its uniform plan. Coppinger worked the overnight shift as a grocery stocker with the informal title of "overnight lead

---

at ¶¶ 89-91). A demotion claim is cognizable under Title VII. *See Jones v. Firestone Tire and Rubber Co.*, 977 F.2d 527, 537-38 (11th Cir. 1992). The court, therefore, construes Wal-Mart's motion as one for partial summary judgment.

[3] Discovery showed the allegedly Hispanic male, Rex Lucas, was Caucasian like Coppinger himself. In his response to Wal-Mart's motion, which addresses the failure to promote claim, Coppinger agrees to dismiss the claim. Consequently, the court does not specifically address the failure to promote claim related to Lucas other than to order its dismissal.

grocery stocker." Coppinger's co-worker, Rex Lucas ("Lucas"), also held the job title of "overnight lead grocery stocker" prior to the introduction of the level system in June, 2004. Despite having the same title, Lucas was Coppinger's supervisor; Coppinger's job was to "support" Lucas on nights Lucas was at work and to stand in his place on nights Lucas was off. The new level system, however, did not include "lead grocery stocker" as a distinct job title. Instead, it classified Coppinger and Lucas as "level two grocery stockers," a job category that did not permit the kind of supervisory functions Coppinger and Lucas had exercised as "lead" stockers. Coppinger was concerned about this classification because he believed his job continued to require him to supervise other level two employees, as well as some level three workers, and believed he should be recognized as a higher-level "support manager." The store manager, Elwin Jones ("Jones"), shared some of these concerns and raised the issue with a Wal-Mart personnel officer, Bea Floyd, in the regional office to which Store 1222 reported. Ms. Floyd told Jones that no employee could have a lead position under the level system because Wal-Mart's new job classifications did not allow grocery stockers to take a lead role. As a result, Coppinger and Lucas remained as level two stockers without supervisory responsibilities. Although Coppinger could no longer carry store keys and "walkie-talkies" as before, his pay and benefits were not affected by the new system.

On March 7, 2005, an "overnight support manager" position became available at Store 1222, and Wal-Mart posted a job notice for it on a board outside the store's personnel office from March 7 through May 5, 2005. Coppinger applied for the job along with fourteen other Wal-Mart associates, including Rex Lucas. Coppinger was interviewed for the position by assistant store manager, Frank Byers, and Lucas was interviewed by assistant manager, Harris Tillman. Byers and Tillman recommended that the job be given to Lucas. Store manager Jones – the final decisionmaker in this case – agreed with the recommendation.[4] Coppinger was upset over management's decision; he felt he should have been given the position, based in part on the positive job evaluations he had received

---

[4] The record does not reflect the exact date of Lucas' promotion, which occurred at some point in May, 2005.

Case No. 3:07cv458/MCR/MD

during his years at Wal-Mart. According to Coppinger, Lucas' promotion negatively affected his job performance; he was "just depressed all the time." Although he was never reprimanded for absences, Coppinger's work attendance following Lucas' promotion was less regular than it had been before.

Lucas was off two nights a week as overnight support manager, and supervisor Kim Stevens ("Stevens") noticed that on those evenings certain job functions, such as keeping the aisles straight and putting trash away, were not being properly carried out in the area Lucas supervised. As a result, Stevens decided that she should designate one of the overnight grocery stockers as a "go-to" person ("the go-to position") who could answer questions other associates might have about when to perform certain tasks; however, the "go-to" position did not involve the same supervisory duties Lucas had. Also, the position was intended to exist only on the two nights a week Lucas was off. Stevens did not believe Wal-Mart needed to post a notice for the position because it was not a separate classification within the company's level system and would not affect the chosen employee's job title, benefits, or salary. Stevens designated Sandra Loggans, a Hispanic employee who had transferred to Store 1222 from another Wal-Mart store in June, 2005, as the "go-to" person on the overnight shift. Consequently, Stevens announced at a September 30 meeting of the overnight stockers that in Lucas' absence they should "go to" Loggans if they had job questions or issues. Coppinger attended the meeting and became upset at Stevens' announcement. He abruptly left the meeting and, several hours later, stated he needed to go to the hospital because of chest pains. After test results at the hospital showed no physical problems, Coppinger went home, took a medical leave of absence from Wal-Mart, and never returned to work.[5]

---

[5] The exact nature of Coppinger's leave is not entirely clear. He testified he was on "vacation time" during part of his leave. He also alleges his leave was taken pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Coppinger's complaint does not include an FMLA claim. Coppinger consulted Dr. Donald Mason on October 20, 2005, in an attempt to obtain workers' compensation benefits due to an alleged stressful work environment, but he did not seek mental health treatment for the stress that allegedly prevented him from returning to work. Although the record does not indicate whether or not Coppinger was awarded workers' compensation benefits, presumably he was not, as Coppinger testified his treating physicians believed he could return to his job duties as long as he worked at a Wal-Mart store other than Store 1222. Wal-Mart twice offered to transfer him to a different store.

On November 9, 2005, Elwin Jones sent Coppinger a letter inviting him to return to work.[6]  Jones also urged Coppinger to appply for a level six managerial position that was then available and offered to apologize to Coppinger and Lucas at a November 15 meeting of the overnight stockers "for [formerly] having you in a position on [sic] leadership without proper pay grade classification and compensation."[7]  Jones carried out his apology at the November 15 meeting even though Coppinger chose not to attend.  On November 16, Wal-Mart posted a notice for a new support manager position similar to the one previously given to Rex Lucas.  Two associates applied, including Sandra Loggans.  Coppinger did not apply.  The posting was closed on November 22, and the job was given to Loggans.  Coppinger himself was already looking for a new job at the time and had completed an application with Century Correctional Institute on September 21, 2005.  Coppinger was offered a job as a correctional officer in February, 2006, and resigned from Wal-Mart on February 11, 2006.  By that time, he had already filed a Charge of Discrimination with the Florida Human Relations Commission, and after receiving a right to sue notice from the EEOC on July 30, 2007, he timely filed the instant suit on October 25, 2007.[8]

## STANDARD OF REVIEW

A motion for summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is

---

[6]  The record does not reflect any objection by Wal-Mart to Coppinger's absence from work.

[7]  Jones' last comment referred to "several months" between the time the new pay system was implemented and the time Coppinger and Lucas were relieved of the supervisory duties they were performing but for which they were not being paid.  On November 17, 2005, Wal-Mart paid Coppinger $2,364.28 for performing supervisory duties during this brief but unspecified period in which he was paid at a level two pay grade instead of the level seven rate he should have received, given his additional duties.

[8]  Discrimination charges properly filed with the Florida Human Relations Commission are deemed to be dually filed with the EEOC.  *See McGhee v. Sterling Casino Lines, L.P.*, 833 So.2d 271, 273-74 (Fla. 5th DCA 2002).

Case No. 3:07cv458/MCR/MD

"material" if it could affect the outcome of a suit under the governing law. *Id*. The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc*., 975 F.2d 1518, 1534 (11th Cir. 1992).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the movant satisfies its burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmovant to produce "specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co*., 475 U.S. at 587 (emphasis omitted). A general denial unaccompanied by any evidentiary support is not sufficient. Fed.R.Civ.P. 56(e)(2). Instead, the nonmoving party must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604,608 (11th Cir. 1991).

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex. . ." 42 U.S.C. § 2000e-2(a)(1). Absent direct evidence of discrimination, which has not been presented here, a claim of disparate treatment under Title VII is examined under the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff has the burden to establish a *prima facie* case of discrimination by a preponderance of the evidence, which, if satisfied, creates a presumption the employer's action was discriminatory. *Id*. at 802; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). An employer can rebut this presumption by offering a legitimate, nondiscriminatory reason that supports a finding the employer's action was not based on unlawful discrimination. *McDonnell Douglas Corp*., 411 U.S. at 802; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). A trier of fact does not have to

believe the employer's proferred reason in order to find the employer has met its burden, "[f]or the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Center*, 509 U.S. at 509 (emphasis in original). Nor is an employer required to persuade the court its reason is "legitimate." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). The employer is only required to show evidence which, taken as true, permits a reasonable fact finder to conclude there was a nondiscriminatory reason for the employment decision. *St. Mary's Honor Center*, 509 U.S. at 509; *Cooper*, 390 F.3d at 725. Once the presumption is rebutted, the plaintiff must show the employer's reason was not the genuine cause for the adverse action but merely a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804; *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). A plaintiff can do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation and citation omitted). The ultimate burden remains with the plaintiff to raise a genuine issue of material fact as to whether the employer's explanation is pretextual and that discrimination was the true cause for the employment decision.[9] *Id*.

**DISCUSSION**

1. The Go-To Position

Coppinger alleges Wal-Mart discriminated against him by choosing Sandra Loggans for the "go-to" position, an act he claims constituted a promotion for Loggans. To make out a *prima facie* case of discriminatory failure to promote, Coppinger must show: (1) he is a

---

[9] The court outlines this well-known standard at some length because neither party articulates the *McDonnell Douglas* framework in their briefs, and Wal-Mart fails to specifically offer a legitimate, nondiscriminatory reason for not promoting Coppinger. Instead, Wal-Mart moves directly from the *prima facie* issue to an attack on Coppinger's anticipated pretext arguments. The familiarity of the burden-shifting standard does not make it a formality to be skipped over lightly. If a defendant fails to meet its burden of production "the court must award judgment to the plaintiff as a matter of law. . . ." *St. Mary's Honor Center*, 509 U.S. at 509. Nevertheless, the court has gleaned from Wal-Mart's pretext argument the reasons for its employment actions. Coppinger also construes Wal-Mart's pretext argument as satisfying the second prong of the *McDonnell Douglas* test and "meet[s] it head on" in an attempt to rebut it. *See Wilson*, 376 F.3d at 1088.

member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected; and (4) an equally or less qualified employee not a member of Coppinger's protected class was promoted instead. *See Denny v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001). A failure to promote claim must involve an "adverse employment action." *See Goffer v. Marbury*, 956 F.2d 1045, 1049 n.1 (11th Cir. 1992); *Alvarado v. Texas Rangers*, 492 F.3d 605, 612 (5th Cir. 2007). Wal-Mart argues that Coppinger cannot meet this standard because the "go-to" position was not a promotion. The Eleventh Circuit has stressed that no uniform rule exists for determining whether an adverse employment action exists, but at a minimum "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir. 2001); *see also Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) ("Whether an action is sufficient to constitute an adverse employment action must be determined on a case by case basis."). Actions without tangible job consequences, including nonmaterial reassignments of job duties, do not qualify. *Davis*, 245 F.3d at 1239. Moreover, an employee's subjective view of the significance of an employer's action is not controlling; "the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*.

Based on the undisputed record, Coppinger cannot show by a preponderance of the evidence that Loggans' new role involved the kind of "significantly different responsibilities" Title VII requires to establish his *prima facie* case. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). This is not to say that the "go-to" position did not involve any change in duties. For example, overnight supervisor Stevens wrote in her work notes after the September 30, 2005, meeting that she was letting Loggans "take the reigns and be in charge" two nights a week. This managerial perception of Loggans' abilities could have boosted her prestige in the eyes of her fellow workers, but Coppinger has not cited any evidence her co-workers saw Loggans in a different light. Wal-Mart itself became concerned Loggans might inadvertently have been placed in a leadership role not allowed by her pay grade and removed her from the "go-to" position forty days later. Jones echoed this fear in his November 9 letter to Coppinger by stating "that Sandra can not take the role

of a lead position, because we would end up with the same situation" Wal-Mart faced when Coppinger had supervisory duties for which he was not paid under Wal-Mart's new level system.[10]  Nevertheless, not every change in an employee's job requirements constitutes a material alteration under Title VII, and the record shows the modifications to Loggans' job duties were relatively minor and did not involve the duties Coppinger formerly had, as Jones feared.  She did not evaluate or "coach" other employees, as Coppinger had done as lead grocery stocker, and she did not schedule their work as Lucas did as overnight supervisor.  According to the record, the "go-to" position required Loggans to do little more than answer questions and "map out who needs to be in what areas, gage [sic] when to start stocking and when to start returns and zoning."[11]  These duties entailed few changes in the job because, according to Stevens, the overnight stockers were already going to Loggans for this help anyway when Lucas was off.  The deposition testimony of Wal-Mart associate, Garland Domingue, confirmed this.  He testified that Loggans was already "pretty much telling [grocery stockers] what to do . . . when to stop stocking when to start zoning, [and] when to pull the freight back" because "[s]omebody had to do it" in Lucas' absence.

Although the "go-to" position gave Loggans some supervisory duties, it was not a promotion because it did not involve "*significantly* different responsibilities, or . . . a *significant* change in benefits."  *See Davis*, 245 F.3d at 1239 (quoting *Burlington Indus.*, 524 U.S. at 761).  In *Davis*, for example, a police officer was twice removed from his usual role as the stand-in Officer in Charge ("OIC") during periods when his shift sergeant was away.  The police officer had a formal title and full supervisory authority when serving as OIC and enjoyed the same deference as the sergeant herself.  The Eleventh Circuit found

---

[10]  Jones' letter assumed Loggans was carrying out the same kind of supervisory duties Coppinger had as "lead grocery stocker."  However, neither Jones' letter nor his deposition testimony indicates he had personal knowledge of what duties Loggans was actually performing as the "go-to" person or that he was even aware she had been in the job since September 30.  He stated the letter was triggered when "an assistant manager brought it to me that they needed someone to fill in when Rex [Lucas] was off, and they were going to use Sandra to fill in."  The evidence shows Loggans was not, in fact, performing all of Lucas' duties as support manager on the nights he was off.

[11]  "Zoning" involved straightening grocery aisles and removing trash as the aisles were restocked.

there was no adverse employment action because the OIC position was transient in nature and, as in the instant case, the officer suffered no change to his salary or benefits. *Id.* at 1244-45. In this case, Loggan's twice-weekly function was a more recurring feature of her job than the officer's OIC designation in *Davis*, but the "go-to" position only formalized what she was already doing informally as a grocery stocker. In contrast to *Davis*, the "go-to" position did not involve full supervisory authority, a change in job title, or the same respect Lucas was entitled to as overnight support manager. In the absence of any change to Loggans' salary or benefits, or any significantly different responsibilities, the court finds the "go-to" position did not involve the kind of altered terms and conditions of employment required for a promotion.[12] "Congress simply did not intend for Title VII to be implicated where so comparatively little is at stake." *Id*. at 1240.

Wal-Mart argues that even if Coppinger could show a *prima facie* case of failure to promote, it named Loggans as the "go-to" person because Wal-Mart considered Loggans better qualified than Coppinger.[13] According to Wal-Mart, Loggans was highly motivated and was already respected by her fellow workers. Stevens described her as "a natural leader," and Rex Lucas testified that Loggans' performance made her the best candidate for the job. This is sufficient to satisfy Wal-Mart's burden of production, and the burden shifts to Coppinger to show these reasons are pretextual and that discrimination was Wal-Mart's true motive. *Crawford*, 529 F.3d at 976.

---

[12] Coppinger also argues that Loggans' "go-to" position was a promotion because it allegedly placed her next in line for the new support manager job she received in November, 2005. According to Coppinger, the fact that Loggans received the November promotion so quickly after getting the "go-to" position is strong evidence that Wal-Mart gave her preferential treatment because she already served as the "go-to" person. No record evidence supports this claim. The fact that Loggans' two positions were linked in time does not mean they were causally connected, and Coppinger points to no evidence suggesting the "go-to" position gave Loggans an advantage in obtaining the support manager's job. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conslusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

[13] As stated above, Wal-Mart makes this argument as part of its attack on Coppinger's anticipated pretext argument, and the court construes it as Wal-Mart's legitimate, nondiscriminatory reason for naming Loggans to the "go-to" position.

Case No. 3:07cv458/MCR/MD

Coppinger first argues that he was better qualified than Loggans because, unlike her, he had supervisory experience in his former role as lead overnight grocery stocker. Standing alone, this argument fails because an employee cannot show pretext merely by establishing that he was better qualified than another employee; he must show the disparity was so great a reasonable fact finder could infer the employer did not believe the successful employee was better qualified. *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001). The summary judgment record fails to support such a claim. Although Coppinger did have some supervisory experience Loggans lacked, supervisors and co-workers alike perceived Loggans as an effective leader who did her job unusually well. Stevens testified Loggans "took the lead" on tasks that needed to be done and that other employees were already going to her instead of Coppinger with their questions even before the "go-to" position was formalized. Co-worker Domingue agreed, adding that Loggans was an "extremely hard worker" who had earned the other employees' respect.[14] Moreover, the "go-to" position primarily involved answering questions, not supervising Loggans' co-workers.

Coppinger also points to assistant manager Harris Tillman's testimony to show he was better qualified than Loggans, but his reliance in this regard is seriously misplaced. Tillman interviewed Rex Lucas for the initial supervisory job given to Lucas and later interviewed Loggans for the second support manager job. No interviews took place for the "go-to" position, and Tillman did not compare Loggans and Coppinger concerning that job. Tillman did testify that he thought Coppinger came in second among the applicants for the first supervisory position, but Loggans was not one of the fifteen Wal-Mart employees who applied for that job. Tillman never implied Coppinger's qualifications were second to

---

[14] Stevens also testified that Coppinger's attendance became problematic and that his co-workers did not "respect him as somebody to go to" for answers. Coppinger complains that no evidence corroborates such testimony, but his objection misconstrues the analytic framework of *McDonnell Douglas*. Wal-Mart has a burden of production, not one of persuasion. *See A.B.E.L. Services*, 161 F.3d at 1331. As such, Wal-Mart is not required to provide corroborative evidence to demonstrate that its preferred reasons are true; its burden is only to produce evidence "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center*, 509 U.S. at 509. Once this is done, the presumption raised by a *prima facie* case goes away, and the full burden of persuasion is Coppinger's. *Id*. at 507-08.

Case No. 3:07cv458/MCR/MD

Loggans' for any job and clearly stated he believed Loggans was the right person for the second supervisory position discussed below. Thus, while the record demonstrates Coppinger was qualified for the "go-to" position, it does not show his qualifications were so superior to Loggans' that Wal-Mart's subjective reasons for choosing her for the position were anything other than job-related.[15]  *See Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation.").

Coppinger's second basis for arguing that Wal-Mart's proferred reasons for offering the "go-to" position to Loggans are pretextual is his belief that the decision makers in this case were improperly motivated by the company's diversity programs.  Although he does not point to any specific link between a decisionmaker and Wal-Mart's policies, Coppinger argues in general terms that Wal-Mart had an unlawful bias with "the net result of enouraging the promotion" of minority employees like Loggans.  Wal-Mart had implemented two company-wide policies at the time the events in this case took place.  The first, known as Placement Diversity Goals ("Placement Goals"), measured the disparity between the rate at which women and minorities apply for managerial positions and the rate at which they obtained such jobs.  Placement Goals kept track of applicants for managerial positions within Wal-Mart's individual stores, but only senior managers above the store-manager level were held accountable for meeting the Placement Goal objectives.  It is undisputed that no decisionmaker in this case, including store manager Elwin Jones, participated in the Placement Goals program.  Moreover, this program did not apply to hourly supervisory positions such as those involved here.  The second program, known as Good-Faith Efforts Goals, applied to all of Wal-Mart's salaried managers, including Jones

---

[15]  The court also rejects Coppinger's claim that the close link between Loggans' starting date at Store 1222 and the "go-to" position show pretext.  Loggans transferred to Store 1222 in June, 2005, and Stevens supervised her and Coppinger approximately four months before September 30, 2005.  The "go-to" position's primary requirement was an ability to answer work-related questions, and Stevens had a reasonable period of time to observe Loggans and Coppinger before making her decision.  Coppinger points to no evidence indicating that Stevens' proferred reasons for choosing Loggans are pretextual.

Case No. 3:07cv458/MCR/MD

and Stevens. Good Faith Efforts Goals required two things from managers: (1) to mentor three employees who were of diverse background from the individual manager's background, and (2) to attend at least one diversity event each year, such as a community activity. The mentoring component did not require any special activity or goal on the part of managers; it only asked them to provide the same kind of guidance and instruction Wal-Mart managers were required to give employees generally. Although ten percent of a manager's job evaluation was based on attending one annual diversity event, notably, the mentoring program was not tied to a manager's evaluation or bonus. Moreover, no manager was required to promote the employees she mentored or to demonstrate any improvement in the mentored employees' job performance.

Coppinger does not dispute this account of Wal-Mart's diversity programs. Nonetheless, he argues that the programs are evidence of discrimination in this case.[16] First, he points out that Stevens mentored Loggans and then jumps to the conclusion that this shows Stevens unlawfully chose her to satisfy Wal-Mart's diversity goals, not to reward Loggans for her leadership skills. Nothing in the record supports this claim, and Coppinger cites no evidence to show Stevens had a discriminatory motive. Neither the "go-to" position nor the support manager position discussed below counted toward the Placement Goal objectives because both positions were hourly positions. No part of Stevens' evaluation or bonus was tied to promoting the employees she mentored under the Good Faith Efforts Goals. Coppinger further claims Wal-Mart's two programs suggest a covert discriminatory motive because minorities like Loggans must be first promoted to lower-level supervisory jobs before they can move into the kind of senior-level positions Wal-Mart's diversity plans are designed to accomplish.[17] Coppinger neither identifies a specific

---

[16] Coppinger alleges the decisionmakers here may "possibly" have had their bonuses tied to fulfilling these goals. The record does not support this allegation, and Elwin Jones testified that no part of any decisionmaker's bonus or compensation was related to Placement Goals or Good Faith Efforts Goals other than attending one diversity event each year. Coppinger does not allege that Stevens' or Jones' attendance or non-attendance at such an event was a factor in Wal-Mart's employment decisions.

[17] Coppinger appears to contend that Stevens and Jones were carrying out Wal-Mart's allegedly discriminatory policies, even though they only applied to higher-level managers. Although neither party argues this directly, Coppinger implies a "cat's-paw" theory of liability, in which a non-decisionmaker's forbidden

Case No. 3:07cv458/MCR/MD

individual at Wal-Mart with a discriminatory motive nor provides any evidence suggesting Jones, Sevens or any other person at Store 1222 was influenced by Wal-Mart's policies. Insofar as he contends the decisionmakers were personally motivated by Wal-Mart's two diversity programs, he fails to cite any portion of the record suggesting that managers at Store 1222 took the Placement Goals or Good Faith Efforts Goals into consideration when making any employment decision. As a result, Coppinger has not raised a genuine issue of material fact that Wal-Mart's proferred reasons for not giving him the "go-to" position are pretextual.

2. <u>The Overnight Supervisor Position</u>

Coppinger also alleges Wal-Mart's failure to promote him to the overnight supervisor position in November, 2005, was discriminatory. Wal-Mart argues that Coppinger cannot show a *prima facie* case of failure to promote in this instance because he never applied for the position. Coppinger concedes Wal-Mart posted a notice for this position on November 16, 2005, and that the job was given to Loggans after two employees other than himself applied. Citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984), however, Coppinger argues his inaction is excusable because he never had an opportunity to apply, and Wal-Mart was required to notify him of the job because the company knew he was interested in it.

The court is not persuaded by Coppinger's reliance on *Carmichael*, which creates an exception to an employee's duty to apply for a position under limited circumstances. *Carmichael* involved a promotion system in which job openings were made known only by means of casual word-of-mouth and not by any formal method. The plaintiff had only minimal access to such information about openings, which were not posted, and the Eleventh Circuit held that when such informal methods for disseminating news about job

_____

animus is alleged to be the reason why Loggans obtained the "go-to" position. *See*, *e.g.*, *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's-paw' to give effect to the recommender's discriminatory animus."). A cat's-paw theory requires a causal link to exist between the decisionmaker and the person with an unlawful motive. *Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1249 (11th Cir. 1998). Here, no evidence supports such a theory.

Case No. 3:07cv458/MCR/MD

openings are used, an employer "has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." *Id*. at 1133. Here, Wal-Mart used the formal procedure for posting job openings required by its written policy, Internal Recruiting RRG 203. That policy required Wal-Mart to post a notice for positions like the support manager job by the employee time clock in the pertinent store and in the company's internal SMART computer system.[18] Neither *Carmichael* nor any subsequent case in this circuit has extended an employer's duty to notify an interested employee of a job opening under these facts. *Carmichael*'s exception to the application requirement is based on the concern that employers may use informal or non-objective procedures to unlawfully discriminate against a class of qualified employees. This concern, however, does not apply in the same manner when, as here, an employer complies with a facially-neutral written policy whose procedures are published and well-known to its employees. Coppinger does not allege he was unaware of Wal-Mart's notice policy, nor has he shown the company prevented him from learning about the November position or discouraged him from applying for it. Moreover, Coppinger fails to show why Wal-Mart should have thought he would be interested in applying for a level seven position in November, 2005, when he claimed (then and now) he had been unable to perform any work duties since September 30. He reinforced the impression he was unable or unwilling to work, as discussed below, by failing to apply for the level six managerial position Jones told him about in his November 9 letter.[19] "[T]here are limited situations where an employee need not necessarily apply for a position before alleging

---

[18] Although Stevens testified that Wal-Mart complied with these requirements, Coppinger argues Wal-Mart did not post the job announcement by the store's time clock, and he relies on his own deposition testimony for support of this claim. This was not his testimony, however. Instead, Coppinger testified that a co-worker named "James" came to his home to say that James had not seen the job posting. James' statement is inadmissible hearsay, and "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (internal quotation and citation omitted).

[19] When asked why he did not enter the store to look for job postings, Coppinger stated: "I told you it was a hostile work environment. I wouldn't put a dog in there at that time; okay? There was no way in hell I was going back in there at that time . . . ." As explained below, Coppinger's work environment did not give rise to constructive discharge.

Case No. 3:07cv458/MCR/MD

discrimination. This case is not one of the limited situations." *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 n.3 (11th Cir. 2003) (internal quotation omitted).

Coppinger argues, however, that Wal-Mart did more than fail to notify him of the job opening; it also actively misled him about it. According to Coppinger, Jones' November 9 letter improperly failed to tell him about the new supervisor position and, as a result, falsely led him to believe no support manager position was available at the time. This overlooks the fact that there was no job to apply for on November 9 because it was not posted until November 16. New positions became available automatically through Wal-Mart's scheduling system, and the record does not indicate what discretion Jones had in creating the new supervisor job or if he had *any* knowledge of it on November 9.[20]

As with the "go-to" position, the court construes Wal-Mart's pretext argument as an indication it chose Loggans for the supervisory position because of her leadership qualities and work abilities. In response, Coppinger makes three additional points to those argued and outlined above. Unlike the first support manager job, which was posted from March 7, 2005, to May 5, 2005, the second position was open for only seven days. Coppinger alleges this implies a discriminatory motive because it limited the number of applicants who could apply. Wal-Mart's written policy, however, only required job notices to be posted for three days, though "[p]ositions may remain posted until a qualified applicant is identified." Coppinger has not shown how extending Wal-Mart's minimum time frame from three to seven days prevented him or other qualified employees from applying for the advertised position. The Eleventh Circuit has repeatedly stated that Title VII does not require a federal court to "sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted).

Coppinger also claims that Jones' November 9 letter is evidence of pretext because the letter invited him to apply for a managerial position that was one step lower than the

---

[20] Assuming Jones knew in advance that a position would be available on November 16, telling Coppinger about it on November 9 would have violated Wal-Mart's written notice policy and treated Coppinger differently than other qualified employees of Store 1222 by unfairly giving him advance notice.

Case No. 3:07cv458/MCR/MD

support manager job. Jones wrote: "We have a department manager position available now that you would qualify [for]. Even losing your overnight differential, you will still gain pay by the fact it is a pay grade 6. I do remember you talking about getting in to the management program. This would be a good step; however you have to apply quickly before all the interviews are finished." Coppinger alleges this shows pretext because the pay for grade six was less than that for the grade seven Loggans' new support manager job carried. This argument, however, presumes that Jones knew about the level seven job on November 9 and misled Coppinger about it in order keep it in reserve for Loggans. As stated above, no evidence supports such a claim.

Finally, Coppinger argues that the fact Loggans' November promotion came less than two months after she got the "go-to" position shows Wal-Mart gave her preferential treatment based on race.[21] Again, he cites nothing in the record to support this contention. Without such evidence, the timing of the second position does not show that Wal-Mart favored Loggans for discriminatory reasons but only that, as it claims, it had strong confidence in her job-related abilities. "Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes." *Denney*, 247 F.3d at 1185. Coppinger has not produced any evidence showing Wal-Mart's preferred reasons are such a mask and, as a result, he has not raised a genuine issue of material fact that Wal-Mart's reasons for promoting Loggans were pretextual.

3. Constructive Discharge

Coppinger also alleges that Wal-Mart's refusal to give him the "go-to" position and support manager jobs constitutes a constructive discharge.[22] Although he does not clarify

---

[21] Although his Title VII claims allege discrimination based on race and sex, Coppinger presents no argument in his Response concerning sex discrimination.

[22] In light of Coppinger's stipulation to dismiss his claim related to Rex Lucas' promotion, the court does not discuss that event as part of Coppinger's constructive discharge claim. The court also does not reach the constructive discharge issue as it relates to Coppinger's demotion claim, as Wal-Mart has not addressed the demotion in its motion.

Case No. 3:07cv458/MCR/MD

whether he was constructively discharged on September 30, 2005, when he permanently left his active duties at Wal-Mart, or on February 11, 2006, when he formally resigned, Coppinger alleges Wal-Mart's personnel decisions made his work environment too hostile for him to remain.[23]  Title VII encompasses liability for constructive discharge, *Penn. State Police v. Suders*, 542 U.S. 129, 142-43 (2004), which occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."  *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citation omitted). To sustain a constructive discharge claim, Coppinger must show that Wal-Mart imposed working conditions so onerous that a reasonable person in his position would have been compelled to resign.   *See Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003).  The threshold for a constructive discharge claim is higher than that for a hostile work environment claim.  *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).  To sustain a hostile work environment claim, a plaintiff must show, among other things, that she was subject to unwelcome harassment severe enough to alter the terms and conditions of employment.  *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002).  By contrast, a plaintiff claiming constructive discharge must show "a greater severity or pervasiveness of harassment" such that resignation is the only reasonable response.  *See Bryant*, 575 F.3d at 1298.  Unlike a hostile work environment claim, which considers a plaintiff's subjective feelings and objective factors, *see Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004), a constructive discharge claim involves only an objective standard.  *See Hipp*, 252 F.3d at 1231.  As in all employment discrimination claims, a plaintiff must show "the employer took an adverse employment action against him on the basis of a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999).

---

[23]  Unlike the demotion claim, Coppinger only briefly alleges constructive discharge in his complaint and did not raise the claim at all in his EEOC complaint.  Nevertheless, the court considers this issue because Wal-Mart has addressed it fully, and the Eleventh Circuit has advised that the scope of an EEOC complaint should not be strictly interpreted.  *See Gregory v. Ga. Dept. of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004).  The constructive discharge claim could "reasonably be expected to grow out of the charge of" a hostile work environment, *id*., and Wal-Mart has clearly construed it in that manner.

Case No. 3:07cv458/MCR/MD

Coppinger plainly cannot meet this standard. Coppinger relies primarily on the argument that he was forced to resign because of Wal-Mart's alleged discrimination against him. As shown above, however, no discrimination occurred here, and nothing in the record suggests other difficulties sufficient to make a reasonable employee believe his working conditions were intolerable. Coppinger was not asked to perform different duties after September 30 than he was before, and he was not subjected to any rude or threatening remarks. In fact, the record demonstrates that Wal-Mart took reasonable steps to assuage his subjective perception of the situation. On August 27, 2005, Coppinger asked to leave work because he felt he had been discriminated against. After speaking with him for some time, Stevens assured Coppinger "that there was a solution to every problem in Walmart [sic] we just have to find it." Three days later Coppinger left work and did not return. Wal-Mart also twice offered to transfer him to a different Wal-Mart store to ease his concern that Store 1222 was a hostile environment, but Coppinger declined them both.

Coppinger cites Jones' November 9 letter as evidnece of Jones' discriminatory intent, but the letter portrays a job environment that was anything but hostile. Jones offered to apologize to Coppinger at a November 15 meeting for having previously placed him in a leadership position not covered by his job description and assured Coppinger he would "be treated with respect" there:

> Jack, I have never lied to you and I will not start now. You may think different, but that's okay. . . . However, my main concern is to do what I can so you will feel comfortable to come back to work. I know that you need your job, income and benefits. We all do. I do not hold grudges nor will I start now. We all have a job to do and we should strive to do it the best we can. We will all make mistakes and how we work through them to an end, reveals what kind of person and associate we are.

Instead of responding to this invitation, Coppinger made no attempt to resolve what he allegedly perceived as an insurmountable problem. Nonetheless, it would defy common sense to conclude that an employer who invites an employee back to work and encourages him to apply for a position higher than his current job is deliberately acting to make the

employee's work conditions intolerable. Even if Coppinger felt that his job were in jeopardy, which he does not directly allege, that would be insufficient for constructive discharge, *see Rowell v. Bell-South Corp.*, 433 F.3d 794, 806 (11th Cir. 2005), because "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Fitz*, 348 F.3d at 978. Courts have refused to find constructive discharge under far more adverse circumstances than those here. *See*, *e.g.*, *Hipp*, 252 F.3d at 1231 (finding that being told one is doing a "terrible" and "lousy job" not enough for constructive discharge); *Fitz*, 348 F.3d at 978 (holding in an age discrimination setting that being berated and told that management planned to fire one are insufficient). In the absence of discrimination or any evidence of overt hostility, Coppinger has failed to show a disputed issue of material fact regarding his constructive discharge claim.

**CONCLUSION**

Coppinger has not shown a genuine issue of material fact that Wal-Mart unlawfully denied him a promotion by awarding the "go-to" and support manager positions to Sandra Loggans or that Wal-Mart constructively discharged him by its actions related to these two events. Further, he has stipulated to the dismissal of his claim that Wal-Mart unlawfully denied him a promotion by choosing Rex Lucas as overnight support manager. Accordingly, it is ORDERED:

1. Defendants Wal-Mart Stores, Inc., Wal-Mart Stores East, L.P., Wal-Mart Stores East, Inc., and Elwin Jones' Motion for (partial) Summary Judgment (doc. 79) is GRANTED. Trial on the demotion claim will be entered by separate order.

2. Plaintiff's failure to promote claim related to Rex Lucas is dismissed with prejudice.

**DONE AND ORDERED** this 30th day of September, 2009.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**